THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BRITTANY EASTON,<br><br>                                    Plaintiff.<br><br>        v.<br><br>ASPLUNDH TREE EXPERTS, CO.,<br><br>                                    Defendant. | **CASE NO. 2:16-cv-01694-RSM**<br><br>**DECLARATION OF YOUNG-JI HAM IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY OF RUSS PERISHO**<br><br>**Note on Motion Calendar:**<br>**Friday, September 1, 2017** |

I, Young-Ji Ham, do hereby declare as follows:

1. I am of legal age, competent to testify to the matters herein, and do so on my own personal knowledge.

2. I am the attorney of record for Plaintiff Brittany Easton in this case. I write this declaration in support of Plaintiff's Motion to Exclude Defendant's Expert Witness, Russ Perisho.

3. Exhibit 1 is a true and correct copy of an emails between Jenna Labourr, attorney for plaintiff, and Casey Bruner, attorney for defendant, dated August 7, 2017 and August 9, 2017.

4. Exhibit 2 is a true and correct copy of Russ Perisho's report, dated August 8, 2017.

DECLARATION OF YOUNG-JI HAM IN SUPPORT OF
PLAINTIFF'S MOTION TO EXCLUDE DEFENDANT'S
EXPERT TESTIMONY - 1

**WASHINGTON INJURY LAWYERS, PLLC**
2211 Elliott Avenue, Suite 200
Seattle, WA 98121
Tel. 425.312.3057 | Fax 206.866.0208

5.  Exhibit 3 is a true and correct copy of Maureen Clark's C.V.

I HEREBY DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE
STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.

DATED this 17th day of August, 2017 at Seattle, Washington.

**WASHINGTON INJURY LAWYERS, PLLC**
*/s/Young-Ji Ham*

_____

Young-Ji Ham, WSBA #46421
Attorney for Plaintiff

DECLARATION OF YOUNG-JI HAM IN SUPPORT OF
PLAINTIFF'S MOTION TO EXCLUDE DEFENDANT'S
EXPERT TESTIMONY - 2

WASHINGTON INJURY LAWYERS, PLLC
2211 Elliott Avenue, Suite 200
Seattle, WA 98121
Tel. 425.312.3057 | Fax 206.866.0208

1

**CERTIFICATE OF SERVICE**

2

The undersigned hereby declares under penalty of perjury under the laws of the State of
Washington, that on the date noted below, a true and correct copy of the foregoing was delivered
3
and/or transmitted in the manner(s) noted below:

4

Francis S. Floyd, WSBA #10642                    [   ] Via Facsimile
5   Casey M. Bruner, WSBA #50168                  [   ] Email per E-service Agreement
Floyd, Pflueger & Ringer, P.S.                       [   ] Via U.S. Mail
6   200 West Thomas Street, Suite 500            [X] Via CM/ECF
Seattle, WA 98119
7   ffloyd@floyd-ringer.com
cbruner@floyd-ringer.com
8   **Attorneys for Defendant**

9

10  Dated this 17th day of August, 2017 at Seattle, Washington.

11
                                           */s/Young-Ji Ham*
12                                         _____
                                           Young-Ji Ham, WSBA #46421
13

14

15

16

17

18

19

20

21

22

23

24

25

DECLARATION OF YOUNG-JI HAM IN SUPPORT OF
PLAINTIFF'S MOTION TO EXCLUDE DEFENDANT'S
EXPERT TESTIMONY - 3

**WASHINGTON INJURY LAWYERS, PLLC**
2211 Elliott Avenue, Suite 200
Seattle, WA 98121
Tel. 425.312.3057 | Fax 206.866.0208

# EXHIBIT 1

 Gmail

**Young-Ji Ham <youngji.ham@gmail.com>**

## Easton v. Asplundh

**Casey Bruner** <cbruner@floyd-ringer.com>                    Wed, Aug 9, 2017 at 10:12 AM
To: Jenna Labourr <Jenna@washinjurylaw.com>, "Francis S. Floyd" <ffloyd@floyd-ringer.com>
Cc: Young-Ji Ham <youngji@washinjurylaw.com>, Jennifer Jimenez <jjimenez@floyd-ringer.com>, Dana Weller <dweller@floyd-ringer.com>

Hi Jenna,

Attached is Mr. Perisho's report.  You will receive Dr. Vandenbelt's report by the end of the week.

Sincerely,

Casey M. Bruner | Attorney
**Floyd, Pflueger & Ringer, P.S.**
200 West Thomas Street, Suite 500
Seattle, WA  98119-4296
206-441-4455
Fax: 206-441-8484

cbruner@floyd-ringer.com
www.floyd-ringer.com

**From:** Jenna Labourr [mailto:Jenna@washinjurylaw.com]
**Sent:** Monday, August 07, 2017 9:33 AM
**To:** Casey Bruner <cbruner@floyd-ringer.com>; Francis S. Floyd <ffloyd@floyd-ringer.com>
**Cc:** Young-Ji Ham <youngji@washinjurylaw.com>
**Subject:** Easton v. Asplundh

Good morning:

I'm checking in on the status of your experts' reports. The deadline for providing these was 7/12. We spoke on 7/11 and we agreed to give you an extension because you did not have them ready yet and Casey indicated at that time that you would only need an additional 2 -- 3 weeks. This Wednesday will be 4 weeks past the original deadline. If we do not receive them by close of business on Wednesday, I will call Friday at 10:00am for a 26(i) conference on this matter. Thank you.

Jenna

--



**Jenna M. Labourr, Esq.**
**Washington Injury Lawyers, PLLC**

**Seattle (Main Office): 2211 Elliott Avenue, Suite 200, Seattle, WA 98121**

**Tacoma: 1201 Pacific Avenue, Suite 600, Tacoma, WA  98402**

**Phone: (425) 312-3057 | Fax: (206) 866-0208**

**Email:** jenna@washinjurylaw.com **| Website: www.washinjurylaw.com**

## Follow us



This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. This message may contain confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute, or copy this e-mail. If you have received this e-mail in error, please notify the sender immediately by e-mail and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing, or taking any action in reliance on the contents of this information is strictly prohibited.

Confidential Attorney Work Product/Attorney-Client Privileged Communication. This message is confidential, attorney work product and subject to the attorney-client communication privilege. It is intended solely for the use of the individual named above. If you are not the intended recipient, or the person responsible to deliver it to the intended recipient, you are hereby advised that any dissemination, distribution or copying of this communication is prohibited. If you have received this email in error, please immediately notify the sender by reply email or delete and/or destroy the original and all copies of the email message.

 **Perisho Report 080817.pdf**
8055K

# EXHIBIT 2

Russ Perisho, PLLC
*Attorney*

206.713.6343

P.O. Box 1719, Poulsbo, WA 98370 | rperisho@gmail.com

## Expert Witness Report

**By Russ Perisho**

**Educational and professional background:**

I am an attorney, hearing officer, and workplace investigator. I obtained an undergraduate degree in 1974 from the University of Illinois. I graduated from Harvard Law School in 1978. Following law school, I became a member of the Washington State Bar Association and began my career as a lawyer. I practiced primarily in the area of employment and labor law, first as an associate and later as a partner, for thirty years with Perkins Coie LLP in Seattle. Perkins Coie is a national law firm and, during my time there, its Seattle employment and labor group was one of the largest in the Pacific Northwest. I served as chair of the group. I have been active in bar and community activities. I served as chair of the Executive Committee of the Labor and Employment Section of the Washington State Bar Association.

In 2008, I left Perkins Coie to continue my practice as a solo practitioner. Subsequently, I provided employment and labor law advice to employers, unions, and individuals. I occasionally work for the University of Washington as a hearing officer in faculty disputes. I regularly perform workplace investigations of discrimination and misconduct allegations for private employers as well as cities, counties, and other public entities.

I am a member of an international organization, the Association of Workplace Investigators. I have given presentations on how to effectively conduct workplace investigations.

I have testified in trial and administrative hearing as a fact witness regarding my investigations.

I am an active member of the Washington State Bar Association and am licensed to practice law in the State of Washington. I have attached a detailed description of my education and work, Attachment A.

**Work in this case:**

I am engaged by defendant in this case, Asplundh Tree Experts, Co. ("Asplundh" or "Company"), to analyze and provide opinions on issues related to the claims made by plaintiffs in this litigation. (The litigation is Brittany Easton v. Asplundh Tree Experts, Co., U.S. District Court, Western District of Washington at Seattle, No. 2:16-cv-01694-RSM.)

My analyses seek to address the following questions:

1. Whether the Company implemented and publicized appropriate anti-discrimination and anti-harassment policies.

2. Whether the Company responded reasonably promptly when it learned that harassing and offensive behavior may have occurred which could be in violation of the Company's policies.

3. Whether the Company conducted an appropriate investigation to gather and determine the relevant facts.

4. Whether the Company took actions that were reasonably calculated to end harassing and offensive behavior.

**Summary of opinions:**

1. The Company implemented and publicized appropriate anti-discrimination and anti-harassment policies, which were regularly provided to their employees. Based on a review of the records, Asplundh took reasonable steps to publicize the policy with its employees. Asplundh's anti-discrimination anti-harassment policy, if implemented as written, should be considered to be an effective employer program to prevent and address unlawful sex harassment consistent with HR best practices, Washington legal requirements and common-sense considerations.

2. The Company responded reasonably promptly when it learned that harassing and offensive behavior may have occurred which could be in violation of the Company's policies.   I conclude based on the available facts that the Company conducted a reasonably prompt investigation, consistent with HR best practices, Washington legal requirements and common-sense considerations.

3. The Company conducted an appropriate investigation to gather and determine the relevant facts.  Six employees, including the complainant (Easton) and the alleged harasser (Mel), were interviewed.  The records do not suggest that the internal investigator was biased.  His position and the record of his investigation suggest that he had the necessary skills to conduct an investigation.  The interviews were conducted so that the relevant facts were elicited and recorded with sufficient detail.  Thorough and accurate notes were kept.  The investigation was promptly initiated and concluded.  Based on these facts and other factors, I conclude that the Company conducted a reasonably thorough investigation, consistent with HR best practices, Washington legal requirements and common-sense considerations.

4. The Company took actions that were reasonably calculated to end harassing and offensive behavior.    Following the investigation, the Company disciplined Mel for "Violation of No Harassment Policy."   Mel was suspended without pay for five days – one work week.  He was told that the next step in discipline would be termination.  He was provided with copies of the Company's policies prohibiting discrimination and harassment, which he signed and agreed to follow. Here, given the totality of the circumstances, a one work week suspension is reasonably proportionate to the offense, particularly in light of this being a first offense of the kind in Mel's thirty years working at Asplundh.

Mel was to undergo retraining on the Company's harassment policy. The training requirement was particularly appropriate here. Good training can be valuable in gaining compliance with employer policies prohibiting harassment. A primary disciplinary goal under best HR practices and the law is not punishment; rather, the employer must initiate steps reasonably calculated to provide a harassment-free workplace for its employees and prevent future violations of the employer's policy. That occurred here.

**Materials supplied/obtained and relied upon:**

I was provided with and relied upon the following materials:

1. Complaint for Damages;

2. Employee Handbook – rev'd 5/2013;

3. Easton Hire Packet;

4. Brittany Easton Personnel File;

5. Joseph Mell Personnel File;

6. Robert Fly Personnel File;

7. Confidential Investigation Report, including file memoranda and emails; and

8. Letter dated August 25, 2015, sent by email and mail from Richard Pitt, General Counsel, Grays Harbor PUD to Shawn Shapiro, Region Manager, copy to Jeff McClain, Contract Construction Superintendent and Linda Trygstad, Human Resource Director.

I obtained and relied upon the Defendant's Answer to Complaint for Damages in the litigation.

I reviewed and relied upon the Company's website, http://www.asplundh.com/. I also reviewed and relied upon the Company's New Employee Orientation videos.

I relied upon various government and professional publications. These include the following:

1. Pamphlet, "Guiding Principles for Conducting Workplace Investigations," Association of Workplace Investigators;

2. Enforcement Guidance, "Policy Guidance on Current Issues of Sexual Harassment," U.S. Equal Employment Opportunity Commission (3/19/90); and

3. How Arbitration Works, (7th Edition, 2012) Kenneth May, Editor-in-Chief.

I relied upon my knowledge of and experience applying the Washington Law Against Discrimination, Ch. 49.60 RCW, including published court cases interpreting the statute.

**Analyses:**

The litigation is brought by a former employee of Asplundh, Brittany Easton, who worked as a flagger.  Her attorneys allege in the Complaint that Easton was subjected to sex discrimination, intentional infliction of emotional distress, negligent hiring and failure to train, and "hostile work environment."   In the Complaint, Easton's attorneys allege a series of events involving an Asplundh employee, Joe Mel, Sr. in 2014 through 2015 that are characterized as discrimination, harassment and predatory behavior.

Asplundh's attorneys answered, generally denying any wrongdoing.   Asplundh's attorneys admitted that Mel was an Asplundh employee and that Easton was at various times supervised by him.

My analysis is impacted by the procedural status of the matter.  It is my understanding that no depositions have been taken and reported to provide additional factual background.  As facts are developed in the course of litigation, I may choose to supplement this report.

**Asplundh's anti-discrimination and anti-harassment policy.**

Based on a review of materials, Asplundh implemented at all material times an appropriate policy prohibiting discrimination and unlawful sex harassment.  The policy included the following critical elements:

-Prominently displayed on the first page of the Employee Handbook was the Company's broad policy statement:

> It is the Company's intent to provide equal employment opportunity in all areas of its employment practices and to ensure that there be no discrimination against any applicant or employee on the grounds of race, color, religion, sex, age, disability, national origin, citizenship status, veteran status, marital status, sexual orientation or gender identity.

The Company policy stated that this anti-discrimination promise extends to "all areas of its employment practices" including "recruiting and hiring, to working conditions, training programs, use of company facilities, and all other terms, conditions and privileges of employment."

-The Company policy was to "work continually toward improving recruitment, employment, development and promotional opportunities for minority group members and women."

-Under the policy, management personnel were to "continue to be guided and motivated by this policy, and with the cooperation of all employees, will actively pursue the related goals of equal and affirmative action throughout the company and all of its subsidiaries."

-The Company had a policy specifically prohibiting unlawful harassment – a "No Harassment Policy."  The Employee Handbook stated:

4

> Asplundh Tree Expert Co. is committed to maintaining a work environment that is free from discrimination and in which employees at all levels can devote their full attention and best efforts to the job. Harassment has no place in the work environment.

-Wrongful harassment from any source was prohibited.

-Examples of improper harassment were provided along with a detailed definition to show what harassment meant:

> Examples of "harassment" covered by this policy include offensive language, jokes, or other physical, verbal, written, or pictorial conduct relating to the race, color, religion, sex, age, disability, citizenship status, national origin, veteran status, marital status, sexual orientation, gender identity or other factors protected by law that would make a reasonable person experiencing such behavior feel uncomfortable or would interfere with the person's work performance.  The examples below are just that - examples. It is impossible to list every type of behavior that can be considered harassment in violation of this policy. In general, any conduct based on these traits that could interfere with an individual's work performance or could create an offensive environment will be considered harassment in violation of this policy. This is the case even if the offending employee did not mean to be offensive. It is essential that employees be sensitive to the feelings of others.

-The Asplundh policy specifically prohibited sex harassment.  The Employee Handbook stated:

> **Sexual Harassment**
>
> Sexual harassment (whether opposite-sex or same-sex) is strictly prohibited. Some examples of the types of behavior that are considered sexual harassment in violation of this policy include: sexually offensive jokes or comments; physical assaults or other touching that is sexual in nature; promising favorable treatment or threatening unfavorable treatment based on the employee's response to sexual demands; displays of sexually oriented reading materials or pictures, including electronic materials; or punishing an employee for complaining of sexual harassment.

-The Employee Handbook listed specific, easily-understood examples of what is prohibited:

> Some examples of the types of behavior that will be considered harassment, in addition to the examples previously stated, based on these characteristics include: jokes or negative comments about these characteristics; displays of reading materials or pictures containing negative material about these characteristics, including electronic materials; vandalism or "pranks" based on these characteristics; name-calling based on these characteristics; or punishing an employee for complaining of these types of harassment.

-In addition to providing specific guidance, the Asplundh policy gave management flexibility to address any type of wrongful harassment that occurred.

5

-The Asplundh policy contained a simple complaint procedure that encouraged employees to report violations.  The Employee Handbook stated: "Asplundh Tree Expert Co. cannot resolve matters that it does not know about."  Employees were told:

> Every employee has a duty to immediately report harassment so that Asplundh Tree Expert Co. can try to resolve the situation. You should report harassment when you feel that you have been harassed or when you have seen someone else being harassed.

-Employees were told how to report complaints:

> To report harassment, call Asplundh Tree Expert Co.'s E.E.O. Officer at 1-800-248-8733, ext. 4439 or contact your immediate Supervisor (Foreperson, General Foreperson, or Supervisor) or your Region Manager. These individuals have been trained to respond appropriately to reports of harassment.

The complaint procedure provided a way to complain if the offending person is the employee's supervisor.

-The Employee Handbook made plain that reports would be investigated and taken seriously:

> Once your report has been received, Asplundh Tree Expert Co. will conduct a prompt and thorough investigation; discuss the results with the complaining employee and, where appropriate, the action to be taken; keep the investigation and results as confidential as possible; and if the complaint is verified, take appropriate corrective action, up through and including termination of the harasser.

-Employees were expressly assured that no retaliation would occur for following Company policy and reporting concerns of harassment:

> No employee will be punished for bringing a report of harassment to Asplundh Tree Expert Co.'s attention or for cooperating in an investigation.

-The Employee Handbook stated in its section on Discipline and Discharge that violation of Company work rules could result in discipline, including discharge.

Asplundh's anti-discrimination anti-harassment policy, if implemented as written, should be considered to be an effective employer program to prevent and address unlawful sex harassment consistent with HR best practices, Washington legal requirements and common-sense considerations.  It makes clear what is prohibited, what steps should be taken to report concerns and what the Company will do upon receipt of concerns.  Employees are properly assured that retaliation for reporting concerns will not occur.

Based on a review of the records, Asplundh took reasonable steps to publicize the policy with its employees.  It appears that new employees were provided with copies of the Employee Handbook and were provided with "Employee Statements" containing the critical aspects of the anti-discrimination and anti-harassment policy, including the complaint procedure.   The

Employee Statement indicated that "[c]omplaints shall be treated in a confidential manner." At least in 2014, applicants for work were required to complete an application that included the Company's anti-discrimination/anti-harassment policy. Applicants were invited to click a link that provided access to the Company's Employee Handbook, which could be printed.

New employees watch two videos that briefly describe the Company, its organization, its safety program and its equal employment policies. From the personnel records, it appears that Easton viewed these videos.

The records show that Mel received numerous copies of the employee handbook and anti-discrimination/anti-harassment policies during his time working for Asplundh. At times, Mel received and signed safety training materials that urged employees to ""Commit to respect all my fellow co-workers." The records show that when Easton applied for work she filled out an application that included the Company's anti-discrimination and anti-harassment policy, and Easton could view or receive the Employee Handbook.

> **The Company's response to learning that harassing and offensive behavior may have occurred which could be in violation of the Company's policies.**

On August 25, 2017, the Company received a letter sent by email from Richard Pitt, General Counsel, Grays Harbor PUD to Shawn Shapiro, Region Manager, copy to Jeff McClain, Contract Construction Superintendent and Linda Trygstad, Human Resource Director. The letter contained information that the Grays Harbor PUD had received information that a female employee of Asplundh may have been the recipient of unwanted sexual comments, attention, or other instances of inappropriate conduct by another Asplundh Co. employee while working on a Grays Harbor PUD worksite.

According to the Company's Confidential Investigation Report dated September 9, 2015 ("Investigation Report"), Jose Martinez, Manager Human Capital for Asplundh, interviewed Easton on August 27, 2015 and August 28, 2015. Others were interviewed between August 27, 2015 and September 9, 2015.

Easton's lawyers allege in the Complaint that Easton and a co-worker talked with an Asplundh crew supervisor, Terry Lonborg, in July 2015 after events alleged to have occurred on July 2, 2015 and "a week or two later." In the Complaint, it is alleged that Lonborg reported harassment to Rob Fly, Asplundh General Foreman. The Complaint also alleges that an employee of the Grays Harbor PUD talked with Fly. Easton's lawyers state in the Complaint that Easton "reached out" to Fly "on or around July 27, 2015." The Complaint alleges that Fly talked with Mel around July 28, 2015.

It is not clear from the records what information was provided to authorized agents of the Company in July 2015. It does appear that the information led to a conversation between Fly and Mel about concerns Easton had with offensive behavior by Mel. Given the timing as alleged in the Complaint, this would be consistent with the Company's policy that complaints of

7

discrimination will be promptly addressed.  However, Fly did not report the information to his management or the Company's EEO officer, which led to discipline for not following Company policy.

The Company received clear notice on August 25, 2017 that its anti-harassment policies may have been violated.  The Company Human Capital Manager began an interview of Easton within two days.  This action was consistent with the Company's statement in its policy that complaints of harassment "will conduct a prompt… investigation."  I conclude based on these facts that the Company conducted a reasonably prompt investigation, consistent with HR best practices, Washington legal requirements and common-sense considerations.

### The Company's investigation to gather and determine the relevant facts.

Martinez interviewed six employees, including the complainant (Easton) and the alleged harasser (Mel).  It was apparent from the records that an investigation should occur, and one occurred.  The records do not suggest that Martinez was biased or was otherwise an inappropriate internal investigator.  His position and the record of his investigation suggest that he had the necessary skills to conduct an investigation.   Martinez appears to have had a sound plan for his investigation. Based on his notes of the interview and related emails/memoranda, the interviews were conducted in a way that the relevant facts were elicited and recorded with sufficient detail.  It appears that thorough and accurate notes were kept.  Relevant witnesses brought up by the allegations were interviewed.   There was no suggestion in the record that confidential information was inappropriately released.   The investigation was promptly initiated and concluded. Based on these facts, I conclude that the Company conducted a reasonably thorough investigation, consistent with HR best practices, Washington legal requirements and common-sense considerations.

### The Company's actions in response to the facts that were acquired in its investigation.

Following the investigation, the Company disciplined Mel for "Violation of No Harassment Policy."   Performance Notice, 9-25-15.   The "situation" was described in detail on the Performance Notice form:

> Joe violated the Company No Harassment Policy with another employee.  Joe will be given five (5) days off and retrained on the Company No Harassment Policy.  This is Joe's first offense of this Policy in his 30 year Career [sic].

Mel was suspended without pay for five days – one work week.  He was told that the next step in discipline would be termination.  He was provided with copies of the Company's policies prohibiting discrimination and harassment, which he signed and agreed to follow.

Based on the facts obtained in the investigation, it was reasonable to conclude that Mel violated the Company's anti-harassment policy.  While there were allegations and concerns that were disputed, there was sufficient information that inappropriate conduct occurred and that the aspects of the conduct were in violation of the Company's policy.  The Company's policy stated

that prohibited harassment must be "based on" a protected characteristic. The Company's policy stated that prohibited harassment included "offensive language, jokes or other physical, verbal, written, or pictorial conduct relating to the employee's race, sex, national origin, age, disability, religion, or other factors protected by law that would make a reasonable person experiencing such behavior feel uncomfortable or would interfere with the person's work performance."

In determining whether and what level of discipline should be administered for violation of the Company's policy, it can be assumed that the Company considered the totality of circumstances including whether the Mel's conduct was offensive and unwelcome, whether it occurred because of sex, and whether the conduct was serious enough to affect the terms or conditions of Easton's employment. Discipline in these kinds of situations can also occur when inappropriate things are said or done that do not rise to the level of harassment in violation of law.

The Company considered the fact that this was Mel's first harassment offense in the course of working thirty years for the Company. It is common for employers in Washington considering discipline to consider the length of employment with the Company and the record of policy compliance during the time worked. This is so particularly in situations where the employee is protected by just cause provisions in a collective bargaining agreement, such as the case here. The fact that an employee is being disciplined for a first offense is a reason often cited by arbitrators who set aside employer termination decisions when the matter is grieved by the union under the just cause provision of the collective bargaining agreement. Considering the employee's record of policy compliance is also fair to the accused employee.

It also occurs that employers consider an employee's service as a union officer or shop steward as a factor militating against the most severe punishment on a range of reasonable options. Employers know that unions will fight aggressively against a discharge of one of the union officers or shop stewards.

Disciplines can be viewed on a continuum ranging from an oral warning to written warning to short suspension (e.g., 1 day) to a long suspension (e.g., one work week) to discharge. Particularly when employees are protected by just cause terms in collective bargaining agreements, an employer must consider whether discipline has been progressive and whether it is proportionate to the offense. Here, a one work week suspension is reasonably proportionate to the offense, particularly in light of this being a first offense.

The retraining is particularly appropriate here. Some employees do not understand that joking or teasing can be a violation of the employer's policy prohibiting sex harassment. Some supervisors and employees misinterpret a failure by employees to object to offensive conduct. Further, employer approaches to sex harassment have changed over the years, and long-time employees sometimes have difficulties understanding how societal, legal and employer views of "offensive" statements have changed. Good training can be valuable in gaining compliance with employer policies prohibiting harassment. A primary disciplinary goal under best HR practices and the law is not punishment; rather, the employer must initiate steps reasonably calculated to

provide a harassment-free workplace for its employees and prevent future violations of the employer's policy.  That occurred here.

Respectfully submitted by Russ Perisho this 8th day of August, 2017.

*****

# EXHIBIT 3



# Maureen Clark

**Three Sixty HR, Inc., Menlo Park, CA**                                                    2012-Present
**(formerly Clark Associates, Menlo Park, CA)**                                             1986-2012
Human Resource Management, Expert Witness Consultation
Internal HR Investigations (PI27972)
- Over 200 clients served in high tech, manufacturing, services, not-for-profit, education, and public sectors.
- Practice has grown solely through client and professional referrals.
- Human Resource management projects focus on:
  - o Infrastructure: setting up, professionalizing and auditing HR functions; developing Employee Handbooks; implementing HR standard practices
  - o Problem solving: resolving difficult interpersonal workplace issues
  - o Neutral fact-finding, internal investigations
  - o Project management: specialized projects such as the nationally-recognized *CareerManagement@Sun*

**Raychem Corporation (now Tyco International), Menlo Park, CA**                           1982-1985
*Human Resources Manager, U.S. Sites Division*
- Managed an HR staff that served over 750 U.S. employees in support functions such as Finance, Distribution, Engineering, Purchasing, Security, Human Resources, Facilities, and Information Technology

**Crocker National Bank (merged into Wells Fargo Bank), San Francisco, CA**               1976-1982
*AVP and Manager*
- Policy Planning, Relocation, Personnel Research
- College Relations
- Career Development

**Pinsker, Winguth & Associates, Sunnyvale, CA**                                          1973-1976
Retained Executive Search
*Research/Search Associate*

**Source EDP/Source Finance, Palo Alto, CA**                                              1972-1973
**Capital Benefit Corporation, San Francisco, CA**                                        1971-1972
**William Kenny & Associates, Saratoga, CA**                                              1970-1971

**Certifications, Education, Memberships, Volunteer Experience**
- SHRM-SCP – Senior Certified Professional (2015-2018), SPHR–CA  –  Senior Professional in Human Resources (2005 – 2018), California certification (2010 – 2018)
- Certificate of Completion, 2012 AWI National Training Institute for Workplace Investigators
- M. Ed., Counseling, San Jose State University (1975)
- B.S., English, University of Francisco (1970)
- **Professional Memberships:**  Forensic Expert Witness Association (FEWA), Association of Workplace Investigators (AWI), Society for Human Resources Management (SHRM), Northern California Human Resources Association (NCHRA), ProVisors, Peninsula Executives Association (PEA), California Chamber of Commerce
- **Nonprofit Volunteer Experience:**  St. Ignatius High School Board of Trustees (2014–Present), Vallombrosa Retreat Center Board (two years); University of San Francisco Board of Trustees (19 years total: six years as Vice Chair, 16 years chairing/serving on the Personnel Committee); Presentation High School Board of Trustees (six years); San Mateo County Child Care Coordinating Council Board (three years); Menlo Park Child Care Action Council Board (three years on the Board, two years as President); St. Raymond Church Parish Council (five years), PEA Board member and past President, ProVisors Executive Committee